# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 14, 2022          Decided May 16, 2023

No. 20-1379

CENTER FOR BIOLOGICAL DIVERSITY AND SIERRA CLUB,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ALASKA GASLINE DEVELOPMENT CORPORATION,
INTERVENOR

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Erin Colón* argued the cause for petitioners. With her on the briefs were *Jeremy C. Lieb*, *Kristen Monsell*, *Nathan Matthews*, *Sara Gersen*, and *Elizabeth Jones*.

*Matthew J. Glover*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, *Robert H. Solomon*, Solicitor, and *Lona T. Perry*, Deputy Solicitor.

2

*Howard L. Nelson* argued the cause for intervenor in support of respondent. With him on the brief was *Kenneth M. Minesinger*.

Before: Rao and Walker, *Circuit Judges*, and Randolph,* *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* Rao.

Rao, *Circuit Judge*: The Alaska Gasline Development Corporation sought authorization to build and operate a system of natural gas facilities. After the Federal Energy Regulatory Commission granted that authorization, the Center for Biological Diversity and the Sierra Club (collectively, "CBD") petitioned this court for review. Some of the issues CBD raises were not exhausted, and we lack jurisdiction to consider them. We reject CBD's other arguments on the merits. FERC's decision to authorize the Alaska Liquid Natural Gas Project was lawful and reasonable. We dismiss the petition in part and deny it in part.

I.

A.

The Corporation seeks to build liquefied natural gas ("LNG") facilities in Alaska's northernmost region, known as the North Slope. There are many productive natural gas wells in this region, and they produce more gas than current infrastructure can liquefy, ship, and bring to market. Due to these infrastructure limitations, much of the gas coming from the North Slope is reinjected into the ground to bolster internal

---

* Senior Circuit Judge Randolph was a member of the panel at the time the case was argued but did not participate in the opinion.

3

pressure and make extraction easier. Reinjection is a relatively low value use for natural gas.

The proposed Project would employ North Slope natural gas for more economically beneficial uses by building facilities to uptake the gas and ready it for pipeline transportation. The gas would be transported by a 42-inch diameter pipeline over 800 miles in length, bisecting Alaska from north to south. The pipeline would partially trace the path of an existing crude oil line. The Project also includes the construction of natural gas liquefaction facilities in the south of Alaska, near the Cook Inlet. Liquefaction reduces the volume of the gas and makes it easier to export by tanker ship. The Corporation has tentative plans to reroute some of the gas, before liquefaction, for use in Alaska. Project facilities are anticipated to uptake, transport, liquefy, and export substantial volumes of natural gas for at least 30 years.

### B.

The Corporation sought FERC approval for its Project. When considering an application for an LNG facility, FERC must comply with the National Environmental Policy Act ("NEPA"), Pub. L. No. 91-190, 83 Stat. 852 (1970) (codified as amended at 42 U.S.C. § 4321 *et seq.*). Under NEPA, FERC was required to prepare an Environmental Impact Statement ("EIS") because the Project was a "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). FERC also must comply with the Natural Gas Act ("NGA"), Pub. L. No. 75-688, 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. § 717 *et seq.*). The Commission must authorize the facility unless doing so would "not be consistent with the public interest." 15 U.S.C. § 717b(a).

4

To comply with NEPA's procedural requirements, the Commission prepared a roughly 1,500 page EIS, which analyzed the Project along a number of dimensions, including the potential impacts on wetlands, marine mammals, fish, drinking water, carbon dioxide levels, rivers, soils, permafrost, vegetation, the aesthetics of Denali National Park, and Alaskan socioeconomics. The Commission evaluated alternatives to the Project and analyzed mitigation measures that could help reduce certain environmental impacts. The Commission concluded the Project would cause a range of temporary, long-term, and permanent environmental impacts.

The Commission authorized the Project subject to 165 environmental conditions. Order Granting Authorization Under Section 3 of the Natural Gas Act ("Authorization Order"), 171 FERC ¶ 61,134 (May 21, 2020). The Commission found that the conditions would adequately mitigate the environmental impacts and that, as modified, the Project would be consistent with the public interest. CBD petitioned for rehearing, arguing that the EIS was deficient in various ways and that FERC had not adequately determined the Project was within the public interest. FERC denied rehearing. Order Addressing Arguments Raised on Rehearing ("Rehearing Order"), 172 FERC ¶ 61,214 (Sept. 11, 2020).

CBD timely petitioned for review of the Authorization and Rehearing Orders, and we granted the Corporation's motion to intervene on behalf of FERC. We have jurisdiction to review the petition under the NGA. *See* 15 U.S.C. § 717r(b).

II.

CBD challenges the Authorization and Rehearing Orders for failure to comply with NEPA and its implementing regulations. We review NEPA challenges under the familiar standards of the Administrative Procedure Act ("APA") to

5

determine whether the agency action was arbitrary and capricious or contrary to law. *City of Oberlin v. FERC*, 39 F.4th 719, 725 (D.C. Cir. 2022); 5 U.S.C. § 706(2)(A). NEPA requires agencies to "take a hard look at the environmental consequences before taking a major action." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (cleaned up). Agencies evaluate these consequences in an EIS, which must consider:

> (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

NEPA is a purely procedural statute, and an agency therefore enjoys latitude when preparing an EIS. We will not set aside an agency action on NEPA grounds if the EIS "contains sufficient discussion of the relevant issues and opposing viewpoints and the agency's decision is fully-informed and well-considered." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 799–800 (D.C. Cir. 2022) (cleaned up). NEPA requires agencies to evaluate the environmental effects of their actions, but the "[p]reparation of an environmental impact statement will never force an agency to change the course of action it proposes." *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (cleaned up).

6

CBD maintains the Commission failed to comply with NEPA and its implementing regulations in five ways. We conclude that CBD's arguments are either not exhausted or fail on the merits.

A.

CBD first argues the Commission inadequately considered alternatives to the Project in contravention of NEPA's implementing regulations.[1] An agency must both evaluate a "no action" alternative to the proposed agency action and must "[r]igorously explore and objectively evaluate all reasonable alternatives" to the action.[2] 40 C.F.R. § 1502.14(a)–(d) (2020); *Gulf Restoration Network*, 47 F.4th at 800. An alternative is reasonable if it is "technically and economically practical or feasible and meet[s] the purpose and need of the proposed action." 43 C.F.R. § 46.420(b) (2019). As we have recognized, "NEPA's injunction that agencies consider the environmental impacts of 'all reasonable alternatives' does not substantively constrain an agency's choice of objectives." *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999). Because some alternatives will be impractical or fail to further the proposed

_____

[1] FERC does not contest that NEPA implementing regulations, which are promulgated by the Council on Environmental Quality, bind it. *Cf. Nevada v. Dep't of Energy*, 457 F.3d 78, 87 n.5 (D.C. Cir. 2006) ("Because the [Council] has no express regulatory authority under NEPA—it was empowered to issue regulations only by executive order—the binding effect of [Council] regulations is far from clear.") (cleaned up).

[2] 40 C.F.R. § 1502 and 40 C.F.R. § 1508 have since been amended, but the amendment did not take effect until after FERC had entered the Orders. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,365, 43,374 (July 16, 2020) (effective Sept. 14, 2020). We cite the regulations in effect at the time of the Orders.

7

action's purpose, agencies may reject unreasonable alternatives after only brief discussion.

1.

CBD faults FERC for discussing in tandem the true no-action alternative (where nothing like the Project is ever built) and the likely no-action alternative (where something like the Project is built). CBD maintains this way of analyzing the no-action alternative was unreasonable and so confusing that it "misled the public and disguised the proposal's true significance."

The Commission reasonably analyzed the relevant no-action alternatives. First, the Commission considered an alternative in which, after FERC denied approval, nothing like the Project would be built. FERC rejected this true no-action alternative because it would not fulfill the Project's purpose, which is to commercialize natural gas from Alaska's North Slope. CBD does not contest that FERC accurately characterized the Project's purpose. FERC's concise rejection of this alternative was reasonable because the Project's purpose was commercialization of North Slope gas. 40 C.F.R. § 1502.14(a).

Second, the Commission analyzed the likely no-action alternative. If this Project were not approved, FERC recognized that substantial incentives would remain to commercialize the North Slope's plentiful gas by building something like the Project. FERC reasonably rejected the likely no-action alternative because any proposal for North Slope gas development would have similar environmental impacts to those of the Project. It was reasonable for the Commission to consider the reality of economic and development opportunities and reject an alternative that would not

8

appreciably reduce environmental impacts. *See Gulf Restoration Network*, 47 F.4th at 800.

Nor was the Commission's analysis confusing. When "reviewing an agency's compliance with NEPA, the rule of reason applies, and we consistently decline to flyspeck an agency's environmental analysis." *Minisink Residents for Env't Preservation & Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014) (cleaned up). In the EIS, Authorization Order, and Rehearing Order, FERC considered and reasonably rejected the no-action alternatives consistent with NEPA and the APA.

2.

CBD also argues the Commission's consideration of alternatives falls short because FERC had to evaluate each alternative along every dimension of environmental impact used to analyze the Project. According to CBD, this parallel evaluation is required because FERC must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14; *see also id.* § 1502.14(a) (requiring the agency to "[r]igorously explore and objectively evaluate all reasonable alternatives").

Rigorously evaluating alternatives means that agencies must assess and compare the environmental impacts of reasonable alternatives. But it does not require assessing each alternative under identical criteria. Some alternatives will be more reasonable than others based on their economic and technological feasibility and how well they serve the purposes of the proposed action. The agency need not provide the same level of detailed analysis for each alternative that it provides for the action under review.

9

The Commission considered reasonable alternatives and rejected them because they would not reduce environmental impacts.[3] FERC considered the Project's impacts along 23 dimensions. FERC then assessed each alternative under some of these 23 dimensions and concluded that no alternative offered a significant environmental advantage over the Project, and in fact some alternatives would impose substantially more environmental harm. For example, FERC rejected a proposed alternative because it would have disturbed more than 6,000 additional acres of land while achieving essentially the same end results as the Project.

FERC's analysis comported with the law. When an alternative has greater projected environmental impacts than the action under review, no statute or regulation prevents the Commission from rejecting the alternative on that ground. It would hardly further NEPA's mandate for informed decisionmaking to require the Commission to analyze obviously inferior alternatives along additional dimensions of environmental impact.

CBD also contends FERC should have more thoroughly considered an alternative pipeline route that would have avoided a state game refuge. Because CBD failed to exhaust this issue in its application for rehearing, and because it provides no reasonable ground for this failure, we lack jurisdiction to consider it. *See* 15 U.S.C. § 717r(a); *id.* § 717r(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for

---

[3] FERC deemed some alternatives unreasonable, *see* 43 C.F.R. § 46.420(b), and rejected those with only brief explanation, *see* 40 C.F.R. § 1502.14(a). CBD does not challenge those parts of FERC's analysis.

10

rehearing unless there is reasonable ground for failure so to do."); *Food & Water Watch v. FERC*, 28 F.4th 277, 284 (D.C. Cir. 2022) (holding the NGA's issue exhaustion requirement is jurisdictional).

B.

CBD next argues the Commission acted arbitrarily and contrary to law by refusing to employ the "social cost of carbon" metric to estimate the significance of the Project's direct emissions of greenhouse gases.

FERC estimated the Project's annual volume of direct emissions and compared these projections with existing Alaskan and nationwide emissions. The Commission concluded the Project's direct emissions would cause a "30–47 percent increase in the annual fossil-fuel combustion inventory in Alaska" and a "0.17–0.28 percent increase in national" emissions. It surveyed several methods for estimating the Project's effects on global climate change, but it concluded these methods were either too broad in "scale and overwhelming [in] complexity" or simply unreliable. The absence of an adequate methodology, combined with a lack of either state or federal emissions benchmarks, left FERC unable to assess the Project's causal effect (if any) on global climate change.

Rather than use the social cost of carbon, the Commission compared the Project's direct emissions with existing Alaskan and nationwide emissions. It declined to apply the social cost of carbon for the same reasons it had given in a previous order. Authorization Order, 171 FERC ¶ 61,134 at PP 42–43 (citing Order Issuing Certificates and Granting Abandonment Authority, 161 FERC ¶ 61,043 at P 296 (Oct. 13, 2017)). First, the Commission recognized the lack of consensus about how to apply the social cost of carbon on a long time horizon.

11

Second, it noted the social cost of carbon places a dollar value on carbon emissions but does not measure environmental impacts as such. Third, FERC has no established criteria for translating these dollar values into an assessment of environmental impacts.

FERC's approach was reasonable and mirrors analysis we have previously upheld. In *EarthReports, Inc. v. FERC*, the Commission rejected the social cost of carbon for the same three reasons it offered in this case. 828 F.3d 949 (D.C. Cir. 2016). We held FERC had not "acted unreasonably in finding the [social cost of carbon] tool inadequately accurate to warrant inclusion under NEPA" analysis.[4] *Id.* at 956. As in *EarthReports*, FERC had no obligation in this case to consider the social cost of carbon.

CBD also contends the Commission acted contrary to law because NEPA regulations require agencies to consider "theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.22(b)(4). In support of its view that the social cost of carbon is such a method, CBD invokes *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, which remanded a FERC order for (*inter alia*) failure to consider whether 40 C.F.R. § 1502.22 mandates a social cost of carbon analysis.[5] 6

---

[4] We have since reached the same conclusion in two unpublished opinions. *Sierra Club v. FERC*, 672 F. App'x 38, 39 (D.C. Cir. 2016) (per curiam) ("This Court has already considered and rejected identical arguments relating to the social cost of carbon."); *Appalachian Voices v. FERC*, 2019 WL 847199, at *2 (D.C. Cir. Feb. 19, 2019) (per curiam).

[5] What was 40 C.F.R. § 1502.22 when FERC did its analysis in 2020 has since been relocated to 40 C.F.R. § 1502.21. *See Vecinos*, 6 F.4th at 1328 (using the provision's new location).

12

F.4th 1321, 1328–30 (D.C. Cir. 2021). CBD's argument is in tension with *EarthReports* and subsequent cases in which we found it permissible not to apply the social cost of carbon methodology because of the lack of scientific consensus. 828 F.3d at 956.

In any event, we lack jurisdiction to consider this issue because CBD's rehearing petition did not raise it. *See* 15 U.S.C. § 717r(a), (b); *Food & Water Watch*, 28 F.4th at 284. CBD discussed the social cost of carbon in its petition but did not root its argument in 40 C.F.R. § 1502.22. CBD cited the regulation one time, in a "*see, e.g.*," citation. That was not sufficient to put FERC on notice, and it certainly does not amount to "set[ting] forth [the argument] specifically." 15 U.S.C. § 717r(a); *see also Ameren Servs. Co. v. FERC*, 893 F.3d 786, 793 (D.C. Cir. 2018) (explaining "objections may not be preserved either indirectly or implicitly") (cleaned up). This case is therefore unlike *Vecinos*, where we noted the petitioner specifically raised the applicability of 40 C.F.R. § 1502.22 in its comments before the Commission and in its rehearing petition. 6 F.4th at 1328.

C.

CBD next argues the Commission violated NEPA and its implementing regulations by refusing to consider the Project's indirect greenhouse gas emissions. A liquid natural gas project can cause two kinds of indirect emissions. Upstream emissions result from the process of extracting natural gas. Downstream emissions are released when end users burn natural gas. *See EarthReports*, 828 F.3d at 955–56 (discussing both kinds of emissions).

At the outset of the EIS, FERC explained the Project's natural gas would either be exported to foreign buyers or sold to domestic users in Alaska. With respect to export-bound gas,

13

the Department of Energy has exclusive jurisdiction over whether to approve natural gas exports, and therefore the Commission "does not have authority over, and need not address the effects of, the anticipated export of the gas." Authorization Order, 171 FERC ¶ 61,134 at P 41. In fact, FERC is "forbidden to rely on the effects of gas exports as a justification for denying" permission to an LNG project. *Sierra Club v. FERC*, 867 F.3d 1357, 1372–73 (D.C. Cir. 2017) (emphasis omitted). FERC's lack of jurisdiction over export approvals also means it has "no NEPA obligation stemming from th[e] effects" of export-bound gas. *Id.* at 1372 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004)). FERC properly recognized the limits of its delegated statutory authority and cabined its NEPA analysis accordingly.

Attempting to avoid these clear jurisdictional lines, CBD maintains FERC's decision whether to approve the Project and Energy's decision whether to approve exports are "connected actions" that cannot be segmented in the NEPA analysis. *See* 40 C.F.R. § 1508.25(a)(1) (2020) (providing an agency must consider "[c]onnected actions, which means [actions that] are closely related" to the action the agency is contemplating); *Del. Riverkeeper Network v. FERC* ("*Delaware Riverkeeper I*"), 753 F.3d 1304, 1313–19 (D.C. Cir. 2014). These regulations ensure that agencies consider the environmental impacts of closely related actions; however, they do not, and cannot, expand FERC's jurisdiction. We decline to adopt CBD's aggressive reading of 40 C.F.R. § 1508.25, which conflicts with our precedent and would require the Commission to consider the indirect effects of actions beyond its delegated authority.

The Commission's discussion of Alaska-bound gas also comported with regulatory requirements. An agency must consider only a project's "reasonably foreseeable" effects, *id.*

14

§ 1508.8(b), and indirect emissions are not reasonably foreseeable if the Commission cannot identify the end users of the gas, *Del. Riverkeeper Network v. FERC* ("*Delaware Riverkeeper II*"), 45 F.4th 104, 110 (D.C. Cir. 2022). FERC acknowledged the Corporation's plans to install at least three taps along the Project's pipeline and to divert some natural gas for sale and use in Alaska. But before these plans could come to fruition, the Corporation would have to contract with prospective customers and secure regulatory approval from Alaska, and various subsidiary pipelines (none of which had been proposed) would have to be built. Given these uncertainties, the Commission explained that the extent, scope, and location of any future interconnections were unknown. Because FERC could not reasonably identify the end users of the gas, its decision not to consider the indirect effects of Alaska-bound gas was lawful. *See* 40 C.F.R. § 1508.8(b); *Delaware Riverkeeper II*, 45 F.4th at 110 (approving FERC's decision not "to estimate emissions associated with … volumes of gas" bound for "an unknown destination and for an unknown end use").

## D.

CBD next argues the Commission did not adequately consider the impact of the Project on the endangered Cook Inlet beluga whales.[6] It maintains FERC's analysis was so cursory as to be arbitrary and capricious, and that FERC failed to consider "cumulative impacts."

First, CBD maintains the Commission did not take a hard look at the impacts of vessel noise on the belugas. We

---

[6] Cook Inlet belugas are one segment of the global beluga whale population. We use the term "belugas" here to refer specifically to Cook Inlet belugas.

15

conclude, however, that FERC's EIS—along with the Biological Assessment of the National Marine Fisheries Service ("NMFS")—was adequately reasoned. The Commission discussed underwater sources of noise (e.g., pile driving, excavation, and dredging), and included a section dedicated to vessel noise. The Commission also acknowledged that the Project would cause an increase in Cook Inlet vessel traffic and that the resulting increases in noise "could disrupt … [the] dive behavior, movements, and vocal activity of whales." To protect belugas and other marine mammals from Project noise, FERC imposed a series of mitigation measures that went beyond those measures proposed by the Corporation. The Commission found these measures brought the Project within the public interest.

CBD proposes alternative ways to analyze the Project's impact on belugas, but it fails to demonstrate the Commission's analysis was unreasonable. To the extent CBD suggests FERC had to address belugas in a separate section of the EIS, we "decline to flyspeck an agency's environmental analysis" by imposing formatting requirements. *Minisink*, 762 F.3d at 112 (cleaned up). To the extent CBD simply disagrees with FERC's decision to approve the Project despite its potential impacts on belugas, NEPA does not compel any particular policy decision by the agency. Rather, NEPA ensures only that an agency has assessed the environmental impacts of proposed actions before authorization. *Lemon*, 514 F.3d at 1315. The Commission carefully identified potential threats to belugas, analyzed their magnitude, and imposed targeted mitigation measures. This approach was entirely reasonable.

Second, CBD argues the Commission did not adequately consider the Project's "cumulative impacts" on beluga whales. Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the [proposed

16

agency] action when added to other past, present, and reasonably foreseeable future actions regardless of what agency … or person undertakes such other actions."[7] 40 C.F.R. § 1508.7 (2020). As we have explained:

> [A] meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Delaware Riverkeeper I*, 753 F.3d at 1319 (cleaned up).

FERC's analysis of cumulative impacts on belugas complied with regulatory standards. FERC examined a wide variety of ongoing and planned projects that would combine with the Project to impact marine mammals, including belugas. For instance, increased ship traffic could cause more mammals to be hit by vessels, increased construction activity could cause more noise pollution, and increased air traffic could disturb cetaceans in particular. Nonetheless, the Commission concluded these cumulative effects would be minor. Moreover, NMFS regulates certain activities affecting marine mammals,

---

[7] This provision was repealed after the agency actions at issue here. *See* Update, 85 Fed. Reg. at 43,375 (effective Sept. 14, 2020) (directing agencies to consider direct and indirect effects and stating, "[c]umulative impact, defined in 40 C.F.R. 1508.7 … is repealed").

17

and this additional layer of regulation would address some of the Project's impacts on belugas.

CBD's objections fail to demonstrate that FERC's consideration was inadequate. CBD maintains FERC ignored or failed to understand the differences between belugas and other marine mammals. But the EIS repeatedly acknowledged and discussed these differences. CBD also suggests FERC's analysis is inconsistent because it acknowledges that impacts on belugas could be "significant" in some circumstances and then concludes that cumulative impacts would be minor. The alleged contradiction is illusory, however, because FERC imposed mitigation measures to minimize the impacts it identified. Finally, CBD argues FERC unreasonably relied on NMFS regulation, even though NMFS is powerless over many of the environmental stressors that affect belugas. But FERC discussed NMFS only at the end of its detailed analysis, and it recognized the limited nature of NMFS's power.

In sum, the Commission properly assessed the cumulative impacts on beluga whales. CBD may disagree with the Commission's policy choice to approve the Project, but the Commission comported with its regulatory obligations.

E.

CBD next argues that FERC's evaluation of the Project's impacts on wetlands was arbitrary and capricious. CBD relies on a difference between FERC's estimate of the number of affected wetlands acres and the estimate the Corporation gave to the Army Corps of Engineers in a parallel permit application.

We find that FERC reasonably acknowledged and addressed the difference in affected wetlands calculations. FERC estimated the Project would permanently affect 8,225 acres of wetlands even after mitigation efforts. While approval

18

of the Project was pending before FERC, the Corporation applied to the Army Corps for a Clean Water Act permit to discharge materials into the navigable waters of the United States. 33 U.S.C. § 1344(a). In its permit application, the Corporation estimated the Project would impact 10,324 acres of wetlands.

The Commission provided two explanations for the apparent discrepancy. First, the estimates were measuring different things. FERC's calculation considered only wetlands proper, whereas the Corporation's estimate included rivers, lakes, and bodies of saltwater. Second, FERC explained the estimates were based on different methods. FERC also consulted with the Army Corps and confirmed that over 99% of the gap in acreage calculation could be explained by the differences in scope and methodology. The Commission rationally accounted for the different acreage estimates, and CBD raises no other objection to the wetlands analysis. *See Gulf Restoration Network*, 47 F.4th at 799–800. We decline to second guess the Commission's reasoned judgment in evaluating the impact on wetlands.

III.

Finally, CBD suggests the Commission's substantive decision to authorize the Project was arbitrary and failed to satisfy the NGA. Under its delegated authority, FERC "shall issue" authorization for LNG facilities "unless" it determines doing so "will not be consistent with the public interest."[8] 15 U.S.C. § 717b(a); *see also Vecinos*, 6 F.4th at 1326. The NGA

---

[8] The Department of Energy has delegated to FERC authority over the approval of LNG facilities. Department of Energy Delegation Order No. S1-DEL-FERC-2006, § 1.21(A) (May 16, 2006); *see also Sierra Club v. FERC*, 827 F.3d 59, 63 (D.C. Cir. 2016).

19

"sets out a general presumption favoring … authorization." *W. Va. Pub. Servs. Comm'n v. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982). FERC's approval of the Project easily comports with the NGA. The Commission expressly concluded the Project was in the public interest because it would have substantial economic and commercial benefits, and these benefits were not outweighed by the projected environmental impacts.

CBD asks us to set aside the Commission's public interest determination on various grounds, including that the Commission failed to take a hard look at environmental harms; ignored impacts on belugas; failed to analyze the social cost of carbon; and did not adequately consider alternatives. In responding to CBD's NEPA challenges, we have already explained why these arguments either fail or are not exhausted, and they fare no better when framed as NGA challenges. FERC's public interest determination was reasonable and lawful.

\* \* \*

In approving the Alaska Liquid Natural Gas Project, the Commission complied with the NGA, NEPA, and the APA. CBD fails to provide any reason for this court to disturb the Commission's reasonable determinations. To the extent the issues raised in the petition for review were not exhausted, we dismiss the petition for lack of jurisdiction. We otherwise deny the petition on the merits.

*So ordered.*